**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

ANDRES BECERRA,

     Plaintiff,

     v.                           No. 1:18-cv-00501-MV-LF

CITY OF FARMINGTON,
STEVEN HEBBE, in his individual capacity,
CASEY MALONE, in his individual capacity,
MATTHEW VEITH, in his individual capacity,
TOM SWENK, in his individual capacity,
DENNIS RONK, in his individual capacity, and
SIERRA TAFOYA, in her individual capacity,

     Defendants.

**<u>MEMORANDUM OPINION AND ORDER</u>**

THIS MATTER comes before the Court on Defendants' Motion for Summary Judgment and Memorandum in Support to Dismiss Portions of the First Amended Complaint ("Motion") [Doc. 70].   The Court, having considered the Motion, briefs, and relevant law, and being otherwise fully informed, finds that the Motion is well-taken and will be granted.

**BACKGROUND**

The undisputed facts material to the instant Motion are as follows.[1]   On May 23, 2013, the City of Farmington hired Plaintiff Andres Becerra to work as a patrol officer at the Farmington Police Department ("FPD").   Doc. 35 at ¶¶ 20-21.   Approximately four years before he was hired, the Department of Veteran Affairs had determined that Plaintiff had service-connected disabilities, including post-traumatic stress disorder ("PTSD") with attention deficit

---

[1] Where facts are in dispute, the Court resolves those facts in favor of Plaintiff for purposes of this motion.

hyperactivity disorder ("ADHD").   *Id.* at ¶¶ 19-20.

During the process of applying for the position at FPD, Plaintiff had to "talk to a panel of PD officers," all of whom he believed worked in "training."   Doc. 72-1 at 3.   One of those officers was Sergeant Kee, whom Plaintiff identified as having been one of his trainers.   *Id.* Plaintiff disclosed to Kee that he had a disability based on his PTSD diagnosis.   *Id.*   Kee told Plaintiff not to mention his PTSD in the application process.   *Id.*

Once Plaintiff returned from the training academy, during a training session, Kee closed the door and said, "do not say anything about your PTSD."   *Id.* at 4.   Thereafter, at some point in 2015 or 2016, while out on a call, Plaintiff "disclosed to a teen in distress that he suffered from PTSD in an effort to talk the teen down from a mental health related confrontation."   Doc. 35 at ¶ 25.   Senior Officer Russom, who was accompanying Plaintiff, heard him say this, and told Plaintiff, "[d]on't say that, because this department will use that against you.'"   Doc. 72-1 at 5.

Plaintiff did not mention his PTSD in the application process.   Doc. 70-1 at 3.   After he was hired, Plaintiff never told anyone in his "chain of command" that he had a disability or reported his PTSD or ADHD diagnosis to anyone in FPD administration.   *Id.* at 4-5.

During his employment, Plaintiff repeatedly failed to complete reports on time, and as a result, was placed on a performance contract, with which he did not comply, resulting in the extension of that performance contract.   Doc. 70-2 at 3; Doc. 72-1 at 18-19.   He also "show[ed] up to work late," had issues with report-writing, in terms of grammar and knowledge of the law, and engaged in "excessive speeding on a couple of occasions."   Doc. 70-5 at 2.   At one point, an internal affairs investigation was conducted regarding his handling of an incident, at the conclusion of which "it was apparent [that Plaintiff] failed to conduct a satisfactory

investigation, . . . failed to activate one of his camera systems for part of the interaction, and he engaged in argumentative discussion with the suspect."   Doc. 72-1 at 19.   Further, Plaintiff exhibited "bizarre" behavior, including an "overly dramatic" demeanor.   Doc. 70-4 at 2.

On October 23, 2016, Chief Steven Hebbe directed Plaintiff to undergo a "fitness for duty" evaluation with Dr. Troy Rodgers.   Doc. 70-6 at 2; Doc. 72-1 at 18.   Hebbe ordered the evaluation because there had been "a number of complaints sustained against [Plaintiff]," and the "disciplinary action" taken against Plaintiff "had started to get more significant."   Doc. 70-6 at 2.   Further, there had been "incidents where [Plaintiff's] reaction to events was concerning to [shift supervisors] Corporal Dennis Ronk and Sergeant Sierra Tafoya, who "felt that, at times, [Plaintiff] was not acting in control, that he was . . . more emotional."   *Id.*   Hebbe noted that they "were on a path now of progressive discipline, and that that discipline was going to continue to be more severe," and that he was not sure that such discipline would "actually accomplish[] what we were trying to accomplish, which was to reach him and fix whatever was going wrong." *Id.*   Accordingly, he decided to "check this up," and "find out if there [was] something else going on," to "find a solution."   *Id.* at 3.   As Malone described it, the evaluation was both to find out what Plaintiff's mental and emotional condition was and to help them "establish expectations for [Plaintiff]."   Doc. 72-2 at 3.

Dr. Rodgers met with Plaintiff on October 29, 2016 and, after reviewing records, wrote a report on November 15, 2016 and November 22, 2016 (the "Rodgers Report"), which he sent to the City of Farmington upon completion.   Doc. 72-2 at 13.   The Rodgers Report indicates that the purpose of the referral was to determine "whether Mr. Becerra is psychologically fit to work as an armed patrol officer who can safely and effectively complete his required job duties." Doc. 72-1 at 21.   In the Report, Dr. Rodgers notes that Plaintiff "was previously diagnosed by

the VA with ADHD and PTSD and he spent a year in treatment." *Id.* at 26.   Dr. Rodgers

concluded that Plaintiff was "considered to be psychologically able to complete his basic job

tasks in a professional, competent, and safe manner for all involved if [three specific criteria]

were met," namely:   (1) the increase of "support mechanisms and work-structure" by FPD,

potential options for which included "a strong remedial FTO influence, corrective action or

performance improvement plans, and participation in a progressive discipline program with

clearly stated expectations"; (2) Plaintiff's attendance at "weekly individual-based cognitive-

behavioral counseling sessions for the next 3-4 months"; and (3) a "psychotropic medication

referral" for Plaintiff for his ADHD and "medication compliance" by him.   *Id.* at 27.

On November 22, 2016, Dr. Rodgers held a telephone conference with Hebbe, Captain

Noon, City Attorney J. Breakell, and Lieutenant Casey Malone to discuss his evaluation of

Plaintiff.   Doc. 70-6 at 3.   During that call, Dr. Rodgers conveyed his opinion that Plaintiff

"could become a functioning police officer and do a good job, meet the requirements of the job,

as long as there was compliance with some recommendations; otherwise, . . . he was not

optimistic that [Plaintiff] could function at an acceptable level."   *Id.* at 4.

On December 13, 2016, a Notice of Corrective/Disciplinary Action was issued as to

Plaintiff, directing Plaintiff to comply with all recommendations from Dr. Rodgers, and to

provide "written documentation from Dr. Rodgers . . . outlining compliance" and turn in such

documentation to Malone on a monthly basis.   Doc. 72-1 at 18.     Plaintiff was also directed to

"abide by the previous performance contract."   *Id.*   Until his separation from FPD, Plaintiff

complied with the directives in the Rodgers Report.   Doc. 72-2 at 4.

Before reviewing the Rodgers Report, Hebbe "did not have any knowledge of [Plaintiff]

having PTSD," and his review of the Rodgers' report was the "first [that he] ever heard of it."

*Id.*   When he learned from the Rodgers Report that Plaintiff had been diagnosed with PTSD, he regretted not having done an evaluation sooner, and was glad they had tried it.   Doc. 72-1 at 13. Hebbe testified that he

> came away from it, especially in light of some of the feedback I got back from Tafoya, through Malone, that [Plaintiff] seemed to be doing better, that he had a good attitude, that he seemed to be complying with getting his reports in, that we weren't getting the complaints like we had been.   I really kind of came away feeling like we had – we'd hit on a true solution, that Doc Rodgers was going to help us get there with Becerra.

*Id.*

When asked whether any of the discipline imposed upon him (*i.e.*, his performance contract, the fitness for duty evaluation, and the notice of corrective action that followed) was based on his Hispanic origin, Plaintiff responded, "I don't know."   Doc. 70-1 at 14.   Plaintiff, however, believed that he "was looked at differently because . . . [he] would show off that [he] was proudly Hispanic."   *Id.* at 12.   Specifically, he would "wear [his] Mexican jersey, be able to speak fluent Spanish, reading and writing, and it was taken advantage of when [he] needed to contact others.   If [he] was the only one on [his] shift, which happened a lot, then [he] was the only officer to take their report because they were Spanish-speaking."   *Id.*   Plaintiff felt that he could not "show off [his] Mexican heritage."   *Id.* at 13.   When he "mention[ed] anything about soccer or trying to get a soccer team together, [he] was ridiculed that it wasn't a real sport."   *Id.* Further, his name was mispronounced:   he "was having everybody just call [him], like 'Andrew,' because they kept mispronouncing [his] first name, unfortunately."   *Id.*

On March 1, 2017, Sergeant Nate Lacey brought a complaint about Plaintiff to either Ronk or Malone, asking that Ronk/Malone review Plaintiff's "video" from an incident that

occurred on February 21, 2017.[2]   Doc. 72-2 at 17.   Malone conducted an internal affairs

investigation based on Lacey's complaint.   Doc. 70-2 at 4.   The report from that investigation

summarizes the incident as follows:

> Officer Becerra made contact with a male subject, later identified as Taahaluta
> Pioche.   After waking Mr. Pioche, Officer Becerra escorted him outside.   Mr.
> Pioche was very intoxicated and bundled up in a heavy winter coat.   His words
> were very slurred and he was unsteady on his feet.   At one point, Mr. Pioche told
> Officer Becerra his hands were "ice cold" (according to the weather map, at this
> specific date and time, the temperature was approximately 32 degrees).   Officer
> Becerra responded by asking Mr. Pioche where he lived.   Mr. Pioche stated,
> "Shiprock" and Officer Becerra told him, "Okay, then you should probably go
> back home.   If you're ice cold and you don't want to be out in the cold, you
> know?"   Mr. Pioche stated it was a long way and he walked to Farmington.
> Officer Becerra explained to Mr. Pioche that if he walked here, he could walk
> home.   Mr. Pioche told him it was too cold.   Mr. Pioche then asked Officer
> Becerra if the heater was on in his car.   Officer Becerra confirmed it was and Mr.
> Pioche asked if he could sit inside.   Officer Becerra told him, "Not right now and
> it wasn't even that cold anymore."   After a few more minutes of discussion, Mr.
> Pioche told Officer Becerra he could have helped him.   Officer Becerra
> responded, "You're a grown man, you could've helped yourself.   How about you
> take some responsibility for yourself, alright?" He then told Mr. Pioche he could
> take him to the Roof but since they were going to let everyone out in
> approximately thirty minutes he didn't see the point.   Mr. Pioche then asked
> Officer Becerra to take him to the Roof.   Officer Becerra told him again there
> wasn't any point since they were about to let everyone out.   Mr. Pioche
> responded, "There is a point.   I'm cold, bro."   Officer Becerra stated, "Alright,
> well go ahead and walk, man."   Mr. Pioche then asked Officer Becerra to give
> him a ride again.   Officer Becerra stated, "You can say please."   Mr. Pioche
> responded, "You can say please."   Officer Becerra stated, "Okay, then go ahead
> and walk, bro."   Mr. Pioche responded by saying, "Please."
>
> At this point, Officer Becerra turns and walks towards his car.   As he's walking
> towards his car, he turns and asks Mr. Pioche if he wants to come with him.   Mr.
> Pioche confirms this.   Officer Becerra then tells him, "Take responsibility for
> yourself, man.   Have some respect."   As they were getting into the car, Mr.
> Pioche says "Thank you."   Officer Becerra's response was, "Uh huh, I'll make
> sure to roll down the windows for you."

---

[2] Ronk testified that Lacey came to him with the complaint and that he, Ronk, completed a
Complaint form; Malone testified that Lacey came to him with the complaint and that he,
Malone, completed the form.   Doc. 72-2 at 16; Doc. 70-2 at 4.

> As Officer Becerra was pulling out of the parking lot, you can hear what sounds like the rear windows rolling down . . . Mr. Pioche asks him why he rolled the windows down, and Officer Pioche states, "I'm hot man.   I've been in here with the heater all night.   It's hot in here."   Mr. Pioche asks Officer Becerra to roll up the window and Officer Becerra doesn't respond.   At this time, you can then see Mr. Pioche pull the hood of his jacket up over his head and leans forward in what appears to be an attempt to shield himself from the cold air.   Once at the Roof, you can hear Mr. Pioche say, "Now you roll it up [expletive]?"

Doc. 72-2 at 18-19.

In connection with the investigation, Malone interviewed Plaintiff on March 14, 2017, and did not interview anyone else.   *Id.* at 7.   During the interview, Malone asked Plaintiff to explain why he only rolled down the back windows.   "Officer Becerra couldn't offer an explanation."   *Id.*   Malone asked him a second time and Plaintiff answered, "I just did, sir.   I rolled the windows down and I kept my own up.   That one is on me."   *Id.* at 20.   At the end of the interview, Plaintiff said, "I've been here before.   I honestly thought I was doing better, even with everything that is going on with me (referencing his mandated counseling with Dr. Rodgers from a prior case)."   *Id.*   Plaintiff was "kind of down on himself and defeated." Doc. 72-2 at 9.   Malone told Plaintiff that he thought "he actually was doing better," to which Plaintiff responded that he was trying, and that "he was irritated with himself and he can't seem to do 'good.'"   *Id.* at 20.   Malone again said that he was doing better, and that he had "been getting his reports turned in on time and he was following up with Dr. Rodgers as mandated," but that "this sort of behavior toward suspects doesn't serve any purpose and that he didn't 'win' by making the cold drunk guy colder."   *Id.*

The investigation report concludes by sustaining findings that Plaintiff "improperly treated a person in custody," noting that Plaintiff "rolled down his windows in what appears to be a successful attempt to make the subject colder," and could not "offer a reasonable explanation for his actions," and that Plaintiff had "unsatisfactory performance," noting that

Plaintiff's "conduct on this call showed an unwillingness to do an assigned task, a failure to conform to work standards, and a failure to take appropriate action on a condition deserving police attention." *Id.*

Malone explained that while "a down subject call is a minor incident," "when officers roll down windows when it's freezing cold and the subject is complaining of how cold he is, it's cruel.   It appears cruel.   So, that is not a minor issue."   Doc. 72-2 at 6.   Further, Malone explained that although there is no specific policy regarding the transportation of transients to shelters, there is "a policy in reference to treatment of persons in custody," which "can be a variety of different things."   *Id.* at 7.   In this case, he explained, "it was rolling down the windows to be mean, to make a person that was cold colder.   And that was why it was sustained."   *Id.*   Malone explained that Plaintiff's reluctance to give Mr. Pioche a ride and his comments to Mr. Pioche before agreeing to do so "demonstrate[d] an unwillingness to do the job that we expect him to do."   *Id.*   The distance between the location where Plaintiff first encountered Mr. Pioche and the Roof was about five or six blocks, or a two-minute drive.   *Id.* at 8.   Malone was not aware of any other incident in Plaintiff's FPD career in which he had been "mean" or "punitive" with anyone.   *Id.* at 9.

On March 16, 2017, Lieutenant Crum and Malone advised Plaintiff that he was being placed on administrative leave.   Doc. 70-2 at 8.   Thereafter, Hebbe recommended to the City Manager that Plaintiff be terminated, based in part on the investigative findings, and in part on Plaintiff's "history of . . . prior disciplinary events and the frequency with which those had happened."   Doc. 70-6 at 6.   Hebbe testified that he did not think that Plaintiff's conduct in connection with the February 21, 2017 incident was because of his PTSD or ADHD.   *Id.* at 7. Hebbe explained his decision to recommend termination as follows:

8

[H]onestly, at the end of the day, his actions with this gentleman, I can't fix mean. You know, it was mean.   He's mean from the start of the conversation, telling him to go back to Shiprock . . . [A]t the end of the day, I felt like – and I did take the weekend [to decide], I felt like it was just mean, and I can't fix that. . . . And that's after an extensive disciplinary history, us sending him for counseling, us putting [him] on a performance work plan.   But at the end of the day, you know, this was the behavior, and I just don't think you can continue with it.

*Id.* at 8.

Because he knew that Hebbe was deciding whether to recommend that he be terminated, Plaintiff discussed with Malone whether he should resign instead of waiting to be terminated; Malone advised him "something to the effect of, if you want to continue employment in law enforcement, it is, generally, better not to be fired from an agency."   Doc. 70-2 at 12.   Malone did not, however, represent to Plaintiff that if he resigned, the investigative findings based on the February 21, 2017 incident would be reversed.   *Id.*   When Plaintiff learned on March 20, 2017 that Hebbe had in fact recommended that he be terminated, Plaintiff submitted a letter of resignation.   Doc. 70-7 at 4.   Because he resigned (rather than being terminated), he had no right to appeal his separation from FPD.   Doc. 71 at 2.

Based on these facts, on May 30, 2018, Plaintiff filed a Complaint for Damages from Violations of the Americans with Disabilities Act, 42 U.S.C. § 1983, Title VII, the New Mexico Human Rights Act, and New Mexico Common Law (the "Original Complaint"), alleging eleven counts against City of Farmington, FPD, Hebbe, Malone, Matthew Veith, Tom Swenk, Ronk, and Tafoya.   Doc. 1.   On September 17, 2018, Plaintiff and Defendant filed a joint motion to dismiss FPD as a defendant.   Doc. 29.   The Court granted that motion on September 27, 2018. Doc. 31.   Thereafter, on July 27, 2018, Defendants Hebbe, Malone, Veith, Swenk, Ronk, and Tafoya filed a motion requesting that the Court dismiss Counts I, VI, and VII of the Complaint. Doc. 18.   In his response, Plaintiff stipulated to the dismissal of Count VII.   Doc. 26 at 19.   In

9

a Memorandum Opinion and Order entered on August 8, 2019, the Court dismissed Counts I, VI,

and VII but granted Plaintiff leave to amend the Original Complaint.   Doc. 34.   On August 14,

2019, Plaintiff filed his First Amended Complaint ("FAC") for Damages from Violations of the

Americans with Disabilities Act, 42 U.S.C. § 1983, Title VII, the New Mexico Human Rights

Act, and New Mexico Common Law.   Doc. 35.   On November 11, 2019, the parties filed a

Stipulation of Dismissal of Counts I, VI, and VII of Plaintiff's FAC.   Doc. 47.

On August 17, 2020, the remaining Defendants, namely, City of Farmington, Hebbe,

Malone, Veith, Swenk, Ronk, and Tafoya, filed the instant Motion, seeking summary judgment

in their favor on the remaining counts of the FAC, namely Counts II-V and VIII-XI.   Plaintiff

opposes the Motion.

## STANDARD

The court must "grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed.

R. Civ. P. 56(a).   The moving party need not "produce evidence showing the absence of a

genuine issue of material fact."   *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).   Rather,

"the burden on the moving party may be discharged by 'showing' – that is, point out to the

district court – that there is an absence of evidence to support the nonmoving party's case."   *Id.*;

*see also Sports Unltd., Inc., v. Lankford Enter., Inc.*, 275 F.3d 996, 999 (10th Cir. 2002)

(Although "[t]he burden of showing that no genuine issue of material fact exists is borne by the

moving party," when "the moving party does not bear the ultimate burden of persuasion at trial,

it may satisfy its burden by pointing to a lack of evidence for the nonmovant on an essential

element of the nonmovant's claim").   Once the moving party has met this burden, the

nonmoving party must "go beyond the pleadings and by her own affidavits, or by the

depositions, answers to interrogatories, and admissions on file, designate specific facts showing

that there is a genuine issue for trial." *Id.* at 324.   In making this showing, the nonmoving

party may not rely on "the mere pleadings themselves." *Id.*

For purposes of Rule 56(a), a dispute is genuine "if there is sufficient evidence on each

side so that a rational trier of fact could resolve the issue either way." *Becker v. Bateman*, 709

F.3d 1019, 1022 (10th Cir. 2013).   "An issue of fact is material if under the substantive law it is

essential to the proper disposition of the claim." *Id.* (citation omitted).   In other words, "[t]he

question . . . is whether the evidence presents a sufficient disagreement to require submission to a

jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* (citation

omitted).   On summary judgment, the court "construe[s] the factual record and the reasonable

inferences therefrom in the light most favorable to the nonmoving party." *Mata v. Saiz*, 427

F.3d 745, 749 (10th Cir. 2005).

## DISCUSSION

In the remaining counts of the FAC, Plaintiff asserts the following:   two claims alleging

discrimination on the basis of a "perceived impairment," one under the American with

Disabilities Act Amendments Act of 2008 ("ADA") (Count II) and one under the New Mexico

Human Rights Act ("HRA") (Count IV); two claims alleging "constructive discharge," one

under the ADA (Count III) and one under the HRA (Count V); two claims alleging

discrimination on the basis of national origin, one under Title VII (Count VIII) and one under the

HRA (Count IX); and two state common law claims, namely, breach of an implied contract of

employment (Count X) and breach of the implied covenant of good faith and fair dealing (Count

XI).   In their Motion, Defendants seek dismissal of each of these claims.   In his response,

Plaintiff objects both to dismissal of his ADA and HRA claims of discrimination based on

perceived impairment and constructive discharge and to dismissal of his common law claims, but provides no response to Defendants' Motion as it pertains to his Title VII and HRA claims of discrimination based on national origin.   The Court addresses Plaintiff's claims in turn.

I.   Plaintiff's "Perceived Impairment" Claims

In Counts II and III of the FAC, Plaintiff alleges that Defendants imposed "discriminatory treatment" on Plaintiff because of his perceived "impairment" or "medical condition" "due to the PTSD and ADHD diagnoses he received prior to and during his FPD employment" in violation of both the ADA and the HRA.   Doc. 35 ¶¶ 87, 91, 103, 107.   ADA "disability discrimination claims that rely only on circumstantial evidence, such as [Plaintiff's], are generally subject to the burden-shifting framework first articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 [] (1973)."   *Manna v. Phillips 66 Co.*, 820 F. App'x 695, 703 (10th Cir. 2020).   The Court similarly analyzes HRA disability discrimination claims under the *McDonnell Douglas* framework.   *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 969 (10th Cir. 2017) (citing *Sonntag v. Shaw*, 22 P.3d 1188, 1197 (N.M. 2001) (generally asserting that the New Mexico Supreme Court applies *McDonnell Douglas* to "determin[e] the sufficiency of a discrimination claim under the NMHRA")).

Under the *McDonnell Douglas* framework, Plaintiff

must first make a prima facie showing of disability discrimination by demonstrating that, at the time he [was subject to an adverse employment action], (1) he was a disabled person as defined by the ADA; (2) he was qualified, with or without reasonable accommodation, to perform the essential functions of his job; and (3) he was [subject to an adverse employment action] because of his disability.

*Id.* (citation omitted).   Plaintiff "must make this demonstration by a preponderance of the evidence."   *Id.*   If Plaintiff "makes that prima facie showing, the burden then shifts to [Defendants] to offer a legitimate, nondiscriminatory reason for [their adverse employment

12

decisions].ˮ   *Id.*   If Defendants do so, "the burden then returns to [Plaintiff] to show that [Defendants'] stated reason for [their decisions] was pretextual."   *Id.*

To demonstrate that "he was a disabled person as defined by the ADA," Plaintiff argues that Defendants regarded him as having a disability based on his PTSD and ADHD diagnoses. The ADA defines "disabled person" as, among other things, "being regarded as having . . . an impairment."   42 U.S.C. § 12102(1)(C).   In turn, the ADA considers a person to be regarded as having an impairment if the person "has been subjected to an action . . . because of . . . [a] perceived physical or mental impairment." § 12102(3)(A).   "In other words, others must have perceived the person as having an impairment and the person must have 'been subjected to an action . . . because of' that perceived impairment."   *Manna*, 820 F. App'x at 703.   Further, others must perceive the person of having an impairment with an actual or expected duration of more than six months.   *Id.*

> Combining these standards and applying them here, Plaintiff first
>
> must demonstrate that he meets the regarded-as-disabled definition of disabled person under the ADA by showing that (1) [Defendants] perceived him as having an impairment, (2) the impairment had a duration of more than six months, (3) [Defendants] perceived the impairment when they [made their adverse employment decisions], and (4) [Defendants made those decisions] because of his perceived impairment.

*Id.* at 704 (citing § 12102(3)(A); *Adair v. City of Muskogee*, 823 F.3d 1297, 1306 (10th Cir. 2016)).   Once he has demonstrated that "he was a disabled person as defined by the ADA," Plaintiff then must show that "he was qualified, with or without reasonable accommodation, to perform the essential functions of his job" and that "he was [subject to an adverse employment action] because of his disability."   *Id.*   If he meets this burden, "the burden then shifts to [Defendants] to offer a legitimate, nondiscriminatory reason for [their] decision[s].   *Id.*   If Defendants do so, "the burden then returns to [Plaintiff] to show that [Defendants'] stated reason

. . . is pretextual.   *Id.*

Here, the parties appear to agree that Defendants became aware of Plaintiff's PTSD and ADHD diagnoses when Dr. Rodgers disclosed them in his Report, which was completed on November 22, 2016 and provided to Defendants upon completion.   Plaintiff asserts, and the evidence supports, that before his interview with Dr. Rodgers, he did not disclose his diagnoses to any of the Defendants, or to anyone in his chain of command.   Doc. 72 at 8-9.   Thus, based on the undisputed evidence, prior to November 22, 2016, Defendants did not perceive Plaintiff as having an impairment.   For that reason alone, Plaintiff cannot meet the regarded-as-disabled definition of disabled person under the ADA for purposes of any adverse employment actions to which he was subjected prior to November 22, 2016.   The record, however, demonstrates two adverse employment actions against Plaintiff after November 22, 2016, the date on which Defendants became aware of Plaintiff's PTSD and ADHD diagnoses:   the December 13, 2016, issuance of the Notice of Corrective/Disciplinary Action (the "Notice") and Hebbe's March 2017 recommendation that Plaintiff be terminated.

*Issuance of the Notice*

As to the Notice, the undisputed evidence demonstrates that Defendants perceived Plaintiff as having an impairment based on his PTSD and ADHD diagnoses (which had been in effect for longer than six months) when they decided to issue the Notice, and that the decision to issue the Notice was based precisely on Plaintiff's impairment:   Dr. Rodgers advised that, given his psychological condition, Plaintiff's success as an officer depended on compliance with certain requirements, and the Notice directed Plaintiff to comply with those requirements.   Doc. 72-1 at 18.   Thus, for purposes of the Notice, Plaintiff has demonstrated that he was a disabled person as defined by the ADA.

14

Further, the evidence demonstrates that, according to the Rodgers Report, if specific criteria were met, Plaintiff "was psychologically able to complete his basic job tasks in a professional, competent, and safe manner for all involved."   *Id.* at 27.   Accordingly, Plaintiff has shown that he was qualified, with reasonable accommodation, to perform the essential functions of his job.   And as noted, the Notice was issued because of his disability.

The burden thus shifted to Defendants to offer a legitimate, nondiscriminatory reason for issuing the Notice.   As Plaintiff concedes, the purpose of the Notice was to "put in place a plan of action to deal with [Plaintiff's] mental and emotional impairments."   Doc. 72 at 10.   The Notice thus was designed to "find a solution" to help Plaintiff succeed, Doc. 70-6 at 3, and thus accommodate Plaintiff's perceived impairment, not discriminate against him for it.

In the face of this undisputed, legitimate purpose of the Notice, Plaintiff has failed to show that Defendants' reason for issuing the Notice was pretextual.   Indeed, as noted, Plaintiff *agrees* that the reason for the Notice was to put into place the requirements identified by Dr. Rodgers as necessary to accommodate Plaintiff's perceived impairment.   *Id.*   As Plaintiff thus has failed to show "either that a discriminatory reason more likely motivated [Defendants] or that [Defendants'] proferred explanation is unworthy of credence," the Court finds as a matter of law that, in issuing the Notice, Defendants did not violate the ADA or the HRA.

*Hebbe's Termination Recommendation*

As to Hebbe's recommendation that the City of Farmington terminate Plaintiff's employment, although Plaintiff has shown that Hebbe perceived him as having an impairment that lasted more than six months, and that Hebbe perceived the impairment when he made his recommendation, Plaintiff has not equally shown that Hebbe made his recommendation *because of* his perceived impairment.   In attempting to make this showing, Plaintiff does not cite to

evidence that Hebbe actually considered Plaintiff's disability, but rather theorizes that because Hebbe's stated reasons for his recommendation, namely, the February 21, 2017 incident and Plaintiff's disciplinary history, are so implausible, the only possible explanation for his recommendation is Plaintiff's impairment:   Hebbe did not want to have "a PTSD service-connected officer in [his] ranks."   Doc. 72 at 13.

Plaintiff first attempts to build support for this theory by identifying flaws in the investigation of the February 21, 2017 incident.   Specifically, Plaintiff asserts that, according to Malone's testimony, the incident was "relatively minor."   *Id.* at 4.   Malone, however, testified that while "a down subject call is a minor incident," "when officers roll down windows when it's freezing cold and the subject is complaining of how cold he is, it's cruel.   It appears cruel.   So, that is not a minor issue."   Doc. 72-2 at 6.

Next, Plaintiff argues that his conduct during the incident did not reflect an unwillingness to do an assigned task, because the "facts" show that Plaintiff "removed the subject from the convenience store where he was sleeping and then transported him to the Roof."   Doc. 72 at 5. Again, Plaintiff cites Malone's testimony, stating that Malone "admitted that there was no unwillingness to do these tasks – they were performed."   *Id.*   But this was only part of Malone's testimony; Malone went on to explain that Plaintiff's reluctance to give Mr. Pioche a ride and his comments to Mr. Pioche before agreeing to do so "demonstrate[d] an unwillingness to do the job that we expect him to do."   Doc. 72-2 at 6.

Similarly, Plaintiff argues that the investigation wrongfully concluded that Plaintiff "improperly treated a person in custody," because the FPD had no policy regarding the "transport of transients to shelters," and its policy governing the "treatment of persons in custody" did not apply to the "transporting of a transient to a shelter."   Doc. 72 at 5.   This

16

argument relies solely on a misstatement of Malone's testimony.    Malone testified that although

there is no specific policy regarding the transportation of transients to shelters, the policy

regarding "treatment of persons in custody" applies to a "variety of things," and was violated by

Plaintiff when he "roll[ed] down the windows to be mean, to make a person that was cold

colder."   Doc. 72-2 at 7.

Plaintiff further asserts that he offered a valid explanation for rolling down the (back)

window:    that "he was hot" and "had left the car running with the windows rolled up and the

heater on while he removed the subject from the store and then spoke with him."    Doc. 72 at 5.

While Plaintiff may have provided such an explanation to Mr. Pioche when he asked him to roll

up the back windows, during the investigative interview, that is not what Plaintiff said.    Rather,

when Malone asked Plaintiff to explain why he only rolled down the back windows, he could not

offer an explanation.    Doc. 72-2 at 7.    And when Malone asked him a second time, he

answered, "I just did sir.    I rolled the windows down and I kept my one up.    That one is on

me."   *Id.* at 20.

Additionally, Plaintiff argues that the investigation was "flawed" because Malone did not

interview anyone other than Plaintiff and because Mr. Pioche himself did not make the initial

complaint.   Doc. 72 at 5-6.   But Plaintiff offers no evidence that FPD internal investigation

protocols require that witnesses be interviewed or that the complaint process be initiated by

someone outside the Department.

Plaintiff also notes that no other FPD officer has been disciplined for similar conduct in

connection with the transport of a transient to a shelter.    *Id.* at 6.    But Plaintiff has shown no

evidence that any other FPD officer conducted himself or herself similarly in connection with the

transport of a transient to a shelter.    Accordingly, the fact that others have not been disciplined as Plaintiff was here is neither surprising nor relevant to the instant inquiry.

Finally, Plaintiff notes that "there was no prior incident" during which he was "'mean' to a citizen during the performance of his police duties," and that "the evidence pointed towards improvement in Becerra's job performance and an increasing ability to perform required tasks." Doc. 72 at 12-13.    If the facts underlying the incident were in dispute, Plaintiff's prior conduct and his improvement in other areas might be relevant.    Here, however, Plaintiff's conduct during the incident is undisputed, and it was this conduct that Hebbe found to be unacceptably "mean."    In fact, Hebbe testified to the effect that Plaintiff's issues in other areas, such as turning in reports, were things that he could "work with," but that during this incident, Plaintiff was "just mean, and [he couldn't] fix that."    Doc. 70-6 at 8.    Thus, neither Plaintiff's prior conduct nor his improvement in other areas had any bearing on the validity of the findings of the investigation or Hebbe's reliance thereon.

In short, none of Plaintiff's attempts to identify flaws in the investigation of the February 21, 2017 incident is availing.    It follows that Plaintiff has failed to substantiate his argument that "FPD exaggerated the incident," "invent[ed] a trumped-up charge," or "created a mountain out of a molehill for the purpose of separating Becerra due to his perceived impairment."    *Id.* at 13-15.

Plaintiff next argues that it is implausible that Hebbe would have based his termination recommendation on Plaintiff's prior disciplinary history, because Hebbe "felt bad for Becerra that the prior discipline was meted out in circumstances where Becerra could not improve."    *Id.* at 6.    As an initial matter, this argument misstates Hebbe's testimony.    Hebbe's statement that he "felt bad for Becerra" was made in the context of his testimony that he felt "glad that [they]

18

ordered the fit for duty," "that it did kind of go with what [he] was fearing, which was he's continuing to rack up complaints," and that he "regretted that [they] hadn't tried [an evaluation] earlier."   Doc. 72-1 at 13.   Hebbe never testified that he felt badly for having disciplined Plaintiff in the past.   Moreover, even if this had been the meaning of his testimony, it would not be inconsistent with his termination recommendation, which Hebbe explained was based on Plaintiff exhibiting "mean" behavior even "after an extensive disciplinary history, us sending him for counseling, us putting [him] on a performance work plan."   Doc. 70-6 at 8.   It is entirely plausible that Hebbe believed that he could not "continue" with Plaintiff's behavior, *id.*, while also feeling badly for him, and thus equally plausible that Plaintiff's disciplinary history factored into his decision to recommend Plaintiff's termination.

For these reasons, Plaintiff has failed to substantiate his theory that Hebbe's stated reasons for his termination recommendation are implausible.   As a result, Plaintiff has failed to demonstrate that Hebbe made his recommendation *because of* Plaintiff's impairment.   And without such a showing, Plaintiff cannot demonstrate that he was a disabled person as defined by the ADA.   *Manna*, 820 F. App'x at 704.   The Court's inquiry thus ends here, and Defendants are entitled to summary judgment in their favor on Plaintiff's claims of discrimination based on a perceived impairment.

Assuming *arguendo* that the Court were authorized to go on to apply the *McDonnell Douglas* framework, however, Plaintiff still would not be able to overcome summary judgment. As discussed above, the first step of *McDonnell Douglas* requires Plaintiff to show not only that "he was qualified, with or without reasonable accommodation, to perform the essential functions of his job," but also that Hebbe made his termination recommendation "because of his disability."   *Manna,* 820 F. App'x at 704.   For the same reasons discussed above in the context

19

of analyzing whether Plaintiff has demonstrated that he is a disabled person, Plaintiff has failed

to show, for purposes of the first step of the *McDonnell Douglas* test, that Hebbe recommended

Plaintiff's termination *because of* his disability.

Further assuming *arguendo* that Plaintiff had been able to carry his burden of

demonstrating both that he meets the regarded-as-disabled definition of disabled person under

the ADA and that Hebbe based his recommendation on Plaintiff's PTSD and ADHD diagnoses,

upon the shifting of the burden to Defendants to justify Hebbe's recommendation, Defendants

succeeded in offering a legitimate, nondiscriminatory reason for that recommendation.

Specifically, Hebbe testified that he recommended to the City Manager that Plaintiff be

terminated, based in part on the investigative findings, and in part on Plaintiff's "history of . . .

prior disciplinary events and the frequency with which those had happened."   Doc. 70-6 at 6.

Hebbe further specifically testified that he did not think that Plaintiff's conduct in connection

with the February 21, 2017 incident was because of his PTSD or ADHD.   *Id.* at 7.   Hebbe

explained his decision to recommend termination as follows:

> [H]onestly, at the end of the day, his actions with this gentleman, I can't fix mean.
> You know, it was mean.   He's mean from the start of the conversation, telling
> him to go back to Shiprock . . . [A]t the end of the day, I felt like – and I did take
> the weekend [to decide], I felt like it was just mean, and I can't fix that. . . . And
> that's after an extensive disciplinary history, us sending him for counseling, us
> putting [him] on a performance work plan.   But at the end of the day, you know,
> this was the behavior, and I just don't think you can continue with it.

*Id.* at 8.

In the face of Hebbe's testimony setting forth his legitimate, nondiscriminatory reasons

for recommending that Plaintiff be terminated, Plaintiff has failed to show that these stated

reasons are pretextual.   To demonstrate pretext, a plaintiff must "show[ ] either that a

discriminatory reason more likely motivated the employer or that the employer's proffered

explanation is unworthy of credence." *Manna*, 820 F. App'x at 705 (citation omitted). "This showing can include, for instance, evidence that other employees were not treated similarly for the same conduct or evidence of weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's stated reason for terminating the employee." *Id.* (citations omitted).

Plaintiff has not shown that other employees were treated differently for conduct similar to that of Plaintiff; indeed, as noted above, Plaintiff has identified no other officers who engaged in conduct similar to that of Plaintiff here. And as discussed above, a review of the evidence belies Plaintiff's arguments as to the implausibility of Hebbe's stated reasons for recommending his termination. Thus, even if the Court were to engage in the *McDonnell Douglas* analysis, Plaintiff's ultimate failure to demonstrate that "a discriminatory reason more likely motivated" Hebbe or that his stated reasons for recommending his termination are "unworthy of credence" would be fatal to his claim. *Manna,* 820 F. App'x at 706.

## II.    Plaintiff's Constructive Discharge Claims

In Count III and Count V, Plaintiff alleges that he was subjected to "intolerable working conditions" when he was forced to choose between resigning, which "would allow him to continue a law enforcement career," or be terminated. Doc. 35 ¶¶ 96, 99, 112, 115. According to Plaintiff, Defendants did not give him "the opportunity to make a true free choice regarding continued FPD employment," and that the "untenable employment position" in which he was placed amounted to an "unlawful constructive discharge" in violation of the ADA and the HRA. *Id.* ¶¶ 99, 100, 115, 116.

As an initial matter, Plaintiff's constructive discharge claim is subject to the same analysis outlined above. Specifically, Plaintiff must demonstrate "that he (1) was disabled; (2)

21

was qualified . . ., and (3) suffered adverse employment action because of the disability."

*Rivero v. Bd. of Regents of Univ. of New Mexico*, 950 F.3d 754, 760 (10th Cir. 2020).    Plaintiff

submitted his letter of resignation upon learning that Hebbe had decided to recommend that the

City of Farmington terminate his employment.    Doc. 70-7 at 4.    As explained above, Plaintiff

has shown that, at the time of Hebbe's recommendation (and thus at the time of Plaintiff's

resignation), Defendants perceived him as having an impairment that lasted more than six

months.    Also as explained above, however, Plaintiff has not shown that Hebbe made his

recommendation, which Plaintiff alleges gave him effectively no choice but to resign, *because of*

his perceived impairment.    As a result, for purposes of his constructive discharge claim,

Plaintiff cannot demonstrate that he was a disabled person as defined by the ADA or make a

prima facie showing under the first step of the *McDonnell Douglas* framework that he was

constructively discharged "because of his disability."    And, for the same reasons discussed

above, Defendants have offered legitimate, nondiscriminatory reasons for Hebbe's

recommendation that Plaintiff be terminated, and Plaintiff has not shown that those reasons are

pretextual.    Thus, Plaintiff's constructive discharge claims fail for the same reasons as do his

claims of discrimination based on his perceived impairment.

      Moreover, Plaintiff's constructive discharge claims fail for the additional reason that,

based on the undisputed evidence, his resignation does not amount to a constructive discharge.

To establish constructive discharge, Plaintiff must show that he "was discriminated against by

his employer to the point where a reasonable person in his position would have felt compelled to

resign," and that he "actually resigned."    *Rivero*, 950 F.3d at 761 (quoting *Green v. Brennan*,

136 S. Ct. 1769 (2016)).    "Essentially, a plaintiff must show that she had *no other choice* but to

quit.    The conditions of employment must be objectively intolerable."    *Sanchez v. Denver Pub.*

*Sch.*, 164 F.3d 527, 534 (10th Cir. 1998) (emphasis in original; citation omitted).   Notably, "[i]f an employee resigns of her own free will, even as a result of the employer's actions, that employee will not be held to have been constructively discharged."   *Baca v. Sklar*, 398 F.3d 1210, 1216 (10th Cir. 2005).

The Court looks to the totality of the circumstances to determine whether a plaintiff's resignation is the result of his or her own free will rather than coercion.   *Parker v. Bd. of Regents of Tulsa Jr. Coll.*, 981 F.2d 1159, 1162 (10th Cir. 1992).   The relevant inquiry is whether those circumstances "indicate [that] the employee did not have the opportunity to make a free choice."   *Id.*   The Court is directed to consider the following factors:   "(1) whether the employee was given some alternative to resignation; (2) whether the employee understood the nature of the choice he was given; (3) whether the employee was given a reasonable time in which to choose; and (4) whether he was permitted to select the effective date of resignation." *Id.*   Importantly, "[a] choice between resignation or termination does not establish that the resignation was involuntary, unless the employer lacked good cause to believe that there were grounds for termination."   *Id.*   Nor does the fear that termination "could have an adverse [e]ffect on [the plaintiff's] career" render the choice to resign involuntary.   *Id.* (finding that plaintiff made a "considered and voluntary decision to resign" because she feared that termination could "have an adverse [e]ffect on her career in academic administration"); *see also Moore v. Hernandez*, No. 02-cv-1445, 2004 WL 7337973, at *5 (D.N.M. Apr. 27, 2004), *aff'd*, 128 F. App'x 39 (10th Cir. 2005) (finding no constructive discharge in part because plaintiff "acknowledged in his deposition testimony that he understood resignation to have a less harmful effect on his future employment prospects than a termination").

Applying these principles here, Plaintiff has not shown "that the choice between

resignation or facing termination caused [his] resignation to be submitted under duress and that [he] had no real choice." *Parker*, 981 F.3d at 1162.   The evidence shows that there were "adequate reasons" relating to Plaintiff's conduct during the February 21, 2017 incident and his disciplinary history for Defendants "to threaten [P]laintiff with termination." *Id.*   It appears from the record that Plaintiff was advised that Hebbe was in the process of deciding whether to recommend termination, and that Hebbe "took the weekend" to make that decision; accordingly, Plaintiff had a reasonable amount of time to reflect and make a considered decision as to whether to resign.   It also appears that Plaintiff decided on the timing of his resignation, choosing to submit his letter upon learning that Hebbe had recommended his termination.   Further, Plaintiff specifically alleges that "his principal motive" in resigning was "to protect prospective law enforcement career opportunities."   Doc 35 ¶ 97.   Thus, it appears that Plaintiff made a reasoned choice to resign rather than wait to be terminated, ostensibly because preserving his law enforcement career opportunities was more important to him than preserving his right to appeal his separation from FPD.   Under these circumstances, "[P]laintiff voluntarily chose to resign and was not constructively discharged." *Parker*, 981 F.3d at 1162.   Defendants thus are entitled to summary judgment in their favor on Plaintiff's constructive discharge claims.

III.   <u>Plaintiff's Claims of Discrimination Based on National Origin</u>

In Count VIII of the FAC, Plaintiff alleges that, because he is of Hispanic national origin, he was "subject to adverse employment actions" in violation of Title VII, namely "unjustified disciplinary action, denial of the same rights and privileges afforded other COF and FPD employees under rules, regulations, and policies with respect to workplace treatment, investigations, promotions, grievances, and disciplinary actions, and the creation of a hostile work environment."   Doc. 35 ¶ 140.   Similarly, in Count IX of the FAC, Plaintiff alleges that,

because of his Hispanic national origin, Defendants "took adverse employment actions against him" in violation of the HRA, "in the form of unjustified discipline, demotions, biased and unprofessional investigations, [and] unfair performance evaluations." *Id.* ¶ 149.

"A plaintiff proves a violation of Title VII either by direct evidence of discrimination or by following the burden-shifting framework of *McDonnell Douglas*." *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012). As noted above, the *McDonnell Douglas* test also applies to HRA discrimination claims. *Muffoletto v. Christus St. Vincent Reg'l Med. Ctr.*, 157 F. Supp. 3d 1107, 1118 (D.N.M. 2015) ("This Court's analysis is identical under the NMHRA because New Mexico has largely adopted federal Title VII and ADEA analysis for the purposes of interpreting the NMHRA."). "Under *McDonnell Douglas*, a three-step analysis requires the plaintiff first prove a prima facie case of discrimination." *Khalik*, 671 F.3d at 1192. "To set forth a prima facie case of [national origin] discrimination, a plaintiff must establish that (1) she is a member of a protected class, (2) she suffered an adverse employment action, (3) she qualified for the position at issue, and (4) she was treated less favorably than others not in the protected class." *Id.* "The burden then shifts to the defendant to produce a legitimate, non-discriminatory reason for the adverse employment action." *Id.* "If the defendant does so, the burden then shifts back to the plaintiff to show that the plaintiff's protected status was a determinative factor in the employment decision or that the employer's explanation is pretext." *Id.*

On the instant motion, Defendants argue that the record is devoid of direct evidence that Plaintiff was discriminated against based on his national origin, and that, while Plaintiff is a member of a protected class and suffered adverse employment actions, there is no evidence that he was treated less favorably than others not in a protected class, and thus Plaintiff cannot make

a prima facie case of discrimination under *McDonnell Douglas*.   Doc. 70 at 21-23.   In his

response, Plaintiff does not address this argument.   Plaintiff's failure to respond in opposition to

Defendants' Motion as it pertains to his national origin discrimination claims "constitutes consent to

grant the [M]otion" as to these claims.   D.N.M. L-R 7.1(b).

The Court agrees that there is no direct evidence that the discipline imposed upon

Plaintiff (*i.e.*, his performance contract, the fitness for duty evaluation, and the notice of

corrective action that followed) was based on his Hispanic origin.   Indeed, when asked whether

these adverse actions were because of his national origin, Plaintiff responded that he did not

know.   Doc. 70-1 at 12-14.   The Court further agrees that the evidence in the record, namely,

that Plaintiff was assigned report-writing when the subject of the report was a Spanish-speaker,

"was looked at differently" for showing that he was "proudly Hispanic," was unable to "show off

[his] Mexican heritage," could not garner interest in a soccer team, and had people call him

Andrew because they had trouble pronouncing Andres, falls short of establishing that Plaintiff

was treated less favorably than others not in a protected class.   Accordingly, based on Plaintiff's

lack of opposition to Defendants' Motion and the lack of evidence to support his national origin

discrimination claims, the Court will grant summary judgment in Defendants' favor on

Plaintiff's Title VII and HRA national origin discrimination claims.

IV.   <u>Plaintiff's Pendent State Common Law Claims</u>

In addition to his federal claims under the ADA and Title VII and his corresponding

claims under the HRA, the FAC includes two claims arising solely from New Mexico common

law, namely, breach of an implied contract of employment and breach of the implied covenant of

good faith and fair dealing (Counts X and XI).   The Court's pendent jurisdiction over these

claims "is exercised on a discretionary basis," and the Tenth Circuit has generally held that "if

federal claims are dismissed before trial, leaving only issues of state law, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice." *Brooks v. Gaenzle*, 614 F.3d 1213, 1229 (10th Cir. 2010) (citations omitted).   The Tenth Circuit has explained its general disinclination "to exercise pendent jurisdiction in such instances because notions of comity and federalism demand that a state court try its own lawsuits, absent compelling reasons to the contrary." *Id.* at 1230 (citations omitted).

Having determined that Plaintiff's federal claims under the ADA and Title VII and his corresponding claims under the HRA are subject to dismissal, only the supplemental or pendent state common law issues of breach of an implied contract of employment and breach of the implied covenant of good faith and fair dealing remain.   The Court finds that these issues are best left for a state court's determination.   *Brooks*, 614 F.3d at 1230.   Accordingly, the Court declines to exercise jurisdiction over Plaintiff's remaining state law claims and dismisses them without prejudice.   *Id.*

## CONCLUSION

For the foregoing reasons, the Court finds as a matter of law that Defendants did not discriminate against Plaintiff based on a perceived impairment in violation of the ADA or the HRA, did not constructively discharge Plaintiff in violation of the ADA or the HRA, and did not discriminate against Plaintiff on the basis of his national origin in violation of Title VII or the HRA.   Accordingly, Plaintiff's claims under the ADA, Title VII, and the HRA will be dismissed.   The Court further finds that, given its dismissal of these claims, it should refrain from deciding Plaintiff's state common law claims of breach of an implied contract of employment and breach of the implied covenant of good faith and fair dealing.

**IT IS THEREFORE ORDERED** that Defendants' Motion for Summary Judgment and Memorandum in Support to Dismiss Portions of the First Amended Complaint ("Motion") [Doc. 70] is **GRANTED** as follows:   Plaintiff's claims alleging discrimination on the basis of a perceived impairment (Count II and IV), constructive discharge (Counts III and V), and discrimination on the basis of national origin (Counts VIII and IX) are dismissed with prejudice; and Plaintiff's breach of an implied contract of employment claim (Count X) and breach of the implied covenant of good faith and fair dealing claim (Count XI) are dismissed without prejudice.

DATED this 30th day of March 2021.

_____
MARTHA VAZQUEZ
United States District Judge

28